Filed 6/13/25  P. v. Pastran CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>ISABEL PATRICIA PASTRAN,<br><br>    Defendant and Appellant. | F086693<br><br>(Super. Ct. No. CR-20-001789)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna F. Reeves, Judge.

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In an information filed September 3, 2020, the Stanislaus County District Attorney charged defendant Isabel Pastran with accessory after the fact (Pen. Code,[1] § 32;

---

[1] All statutory references are to the Penal Code unless otherwise noted.

count II.)  The same information charged her co-defendant, Jose Andrade, Jr., with murder (§ 187; count I) and a firearm enhancement (§ 12022.53, subd. (d).)  The two were tried together before a jury in a trial that began in April 2023.

The jury convicted Pastran as charged.[2]  The court sentenced her to 10 months in custody and 6 months of mandatory supervision.

Pastran contends the trial court erroneously excluded the testimony of her crime scene expert, Dr. Brent Turvey.  We disagree and affirm the judgment.

## FACTS

On January 29, 2020, Ralph Vigil went to the Venice Motel room of his friend, J.N.  They drank a couple beers together, and Vigil also had about "half a shot" of whiskey.  After about 10 minutes, Vigil said he needed to go see somebody and would be right back.  J.N. testified Vigil left without his bike, which remained with J.N.  However, surveillance video showed Vigil getting on a bicycle upon leaving the room, with a bottle in his hand.

Vigil's friend E.Y. had been out collecting recyclables that day and was approaching Almond Street when he saw Vigil on his bicycle.  He saw Vigil almost get hit by a car.  Vigil had to pick up the front wheel of his bicycle to avoid being hit.  Vigil got into an argument with someone in the car through the passenger-side window.  The passenger, later identified as Andrade, told Vigil they could "solve the problem or fight it out."  Andrade told Vigil to "meet up at Venice."  Vigil told E.Y. to come with him.

The car drove into the parking lot of the Venice Motel.  Vigil approached the car saying things like, "let's fight" and "let's handle it."  Vigil never threatened to kill Andrade, and had no weapons or other items in his hands.  E.Y. got his first glimpse of the driver, who was female.  She exited and told them to "stop" and that they "don't have

---

[2] The jury convicted Andrade of murder and found the firearm enhancement true, but found an allegation that he committed the murder intentionally, deliberately, and with premeditation to be not true.

to do this." Andrade exited the vehicle, acted as if he was going to punch Vigil, and then pulled out a gun and shot Vigil. E.Y. "believe[d]" Andrade fired three shots. Vigil said "why," and ran away towards room 105, and fell down. Vigil tried to get on his bike, but could not. Andrade and the female got into the car and "took off."

A minute or two after Vigil left the room, J.N. heard gunshots. Vigil ran across the parking lot and told J.N. to open the door. Vigil ran inside and said he had been shot. J.N. called 9-1-1. Vigil initially laid on the bed, then got up and laid on the front porch.

J.N. never saw Vigil with any weapons that day.

Officer Donna Anthieny with the Turlock Police Department responded to the Venice Motel after dispatch received a call at 10:06 p.m. When she arrived, individuals were standing in the parking lot flagging officers down. There was a male lying on the ground in an island grass area in front of a room. He identified himself as Ralph Vigil.

Vigil was grunting and moaning in pain. He said he had been shot once in the front and once in the back. Vigil said he did not know who shot him.

Officer Anthieny was unable to locate the front wound that was causing a pool of blood on his chest. However, she did locate the wound on his back and began rendering aid.

One of the bullets had entered the left side of Vigil's abdomen. Vigil also had an exit wound on the right side of his back. A bullet had penetrated his stomach, duodenum, pancreas and mesentery. Vigil died during emergency surgery performed in response to his gunshot injury.

The car Andrade was in at the time of the incident was silver, except for the hood which was black. The car also had a dark colored stripe on its left front fender.

Officer Anthieny testified that the police department receives many calls to respond to crime in the area of the Venice Motel.

3.

*Pastran's Testimony*

Pastran testified to a different version of events. As Pastran was leaving her father's house on January 29, 2020, she saw that the driver's side door of her car was open. The seats had been moved and items were missing from inside the car. Pastran saw a couple people on bicycles nearby. Andrade asked one of the people, who turned out to be Vigil, if he had broken into the car. Vigil said no, and said that he could have Andrade "erased." Pastran understood this to mean Vigil could have Andrade killed. Vigil said they "didn't know who [they] were fucking with." During this encounter, a tall man driving a white Malibu said, "watch your backs" and that "somebody" was going to "get" them.

Pastran denied telling Vigil to meet them at a hotel. She also said she never heard Andrade tell Vigil to meet him at the Venice Motel.

Pastran drove herself and Andrade to visit her mother, who was living at the Venice Motel. She denied almost hitting anyone with her vehicle. Nonetheless, Vigil followed her vehicle to the Venice Motel. Vigil threatened Andrade, saying he would have him "erased," that he was 51 years old and had family members "to take care of his problems[.]" Vigil was being loud and aggressive, and had a bottle in his hands. Andrade got out of the car and spoke with Vigil. Pastran claimed in her testimony that she stopped paying attention to their exchange because she was planning to get out and talk to her mother. Vigil then approached Andrade. At some point, Pastran realized Vigil had been shot. Pastran pushed Andrade into the car and drove away.

Pastran did not turn herself in after the incident because she was six months pregnant. Pastran later helped remove black stickers from the car involved in the incident.

*Further Dispute Over Subject of Disagreement Between Vigil and Andrade*

Pastran's mother, Patricia, claimed in her testimony that she told a Detective Frank Navarro that the dispute was about someone breaking into the car and saying, "I'll blast

you." Patricia testified that she never heard anything about someone cutting another person off. However, Detective Navarro testified that, on the day after the incident, Patricia told him the argument had been about someone cutting someone else off. In a second interview less than one month later, Patricia again told Navarro the argument was about someone cutting someone else off. Patricia never told Navarro someone had said, "I will blast you." Patricia told Navarro she saw or heard Andrade shoot Vigil four times.

*Pastran's Prior Inconsistent Statements*

Pastran told Navarro she was not involved in the homicide, was not driving the car, and that the people depicted in video footage of the incident were not her and Andrade.

In her interview with Navarro, Pastran said that as she was leaving the house, the driver's side door of the car was open. She saw one person on a bicycle (not a "couple"), and claimed the person was staring at them. She thought the person was trying to steal the car, so she followed the person. The person tried to hide behind trash cans.

Pastran did not say anything to Navarro about multiple people on bicycles outside her father's house, nor anything about a man in a white Malibu who told them to "watch their backs," nor anything about Vigil saying he had family to take care of his problems or that he would have them erased. Pastran told Navarro that Vigil had no weapons.

Testing indicated that Vigil had ethyl alcohol and methamphetamine in his system. The amount of methamphetamine in Vigil's system registered in the "potentially toxic" range. A defense expert testified that methamphetamine can "make an individual angry or angrier than they normally would become under similar circumstances." He also testified that the drug is "associated with violent, violent behavior."

**DISCUSSION**

I.     The Trial Court did not Abuse its Discretion in Excluding Defense Expert
       Brent Turvey

Before trial, Pastran filed a witness list that included Brent Turvey, Ph.D. Her trial

brief, filed the same day, stated that "Defense expert Brent Turvey is a crime scene analyst and crime scene reconstructionist, who will be able to integrate for the jury the times, distances, and other relevant data in the case and intersectionality of people and events."

The prosecution filed a motion to "exclude and limit" defense expert testimony and requested an Evidence Code section 402 hearing ("402 hearing"). The motion argued that Turvey's "opinion that the victim was the primary aggressor and Defendant Andrade acted in self-defense is an ultimate issue which is for the jury to decide and is impermissible expert testimony." The motion also posited that it was Pastran's burden to explain how Dr. Turvey would assist the jury.

The court held a 402 hearing at which Dr. Turvey testified. He stated the defense hired him "to reconstruct the elements of the crime that were observable or that were demonstrable by physical evidence and to address issues related to the targeting of the victims, the context of the crime, and whether or not there [were] any elements of the crime that supported the possibility that the – of self-defense."

Dr. Turvey reviewed police investigative reports, defendant interviews, crime scene photographs, surveillance footage from the Venice Motel, the Turlock Police Department's website, and crime statistics.

Dr. Turvey was asked about the opinions he arrived at regarding the present case. He described his first opinion as follows:

> "The first thing is about the intersectionality and the context of the defendants. That is for them for their context in this case they have an increased vulnerability and risk from their perspective. That is the first. For being the victims of a violent crime and for potential negative interactions with law enforcement."

The second "opinion" Dr. Turvey offered was that law enforcement's crime scene processing "did not reveal the weapon that was in the hand of the victim in this case … which is the bottle."

Dr. Turvey also said he would opine on the use of "defensive force," and that Andrade and Pastran had a "defensive attitude and posture." However, he acknowledged this fact was "[c]learly evident from watching the video." Dr. Turvey acknowledged that the determination on self-defense was one for the jury to make. Dr. Turvey stated he would answer questions to the best of his ability without making a legal conclusion, especially about self-defense.

Finally, Dr. Turvey would offer his opinion that "there are legitimate explanations for leaving the scene of a crime which this case falls into that category. And there are also reasons that people may not turn themselves in for a crime."

The court stated it did not "think [Dr. Turvey's] qualified to testify about … whether it's a high crime area or not."

The court also stated, "the subject matter of overpolicing and common knowledge among certain populations of which he is not a part, I recognize seems to be beyond the scope of the foundation for his expert opinion. His expert opinion – his expertise is in forensic criminology. He describes that as the interplay between science and the mechanics of a crime. That's where his expertise is. [¶] Insomuch as they reflect on what the Hispanic population is feeling in any location, I think, is outside of his expertise, and he hasn't demonstrated to my satisfaction he has any better insight into those kinds of issues than anyone else." The court stated it would make a final ruling in the future.

The court ultimately excluded Dr. Turvey. The court ruled,

> "With respect to increased vulnerability. I don't find that his qualifications are suitable to allow him to opine in front of the jury increased vulnerability based on being Hispanic, low income, high crime, or the condition of being pregnant. That's also not a – in my view a proper subject for expert testimony in this case.

> "The jurors will decide if there was flight, and if there was flight, what significance to attach to that conduct.

> "With respect to his – I'm sorry. With respect to his increased vulnerability, the jurors will decide whether or not the actions of the defendants

7.

put them in a particular position and, if so, what position that was, and what affect, if any, that had on their conduct.

"With respect to his opinion about their [*sic*] being noncriminal reasons for flight, that also is within the jury's purview. His opinion seems to be based on speculation and in my view it's not a proper subject for expert testimony.

"Again, the jurors will determine if there was flight and, if so, what meaning and importance to attach to that conduct.

"The major issue he talked about that I think is most problematic is what he describes as defensive context. He used the [term] defensive context. And in that definition he includes types of force. Types of force when questioned about it in his view includes whether something can be described as brutal force, overkill, defensive force, and others.

"In this case his opinion is that defensive force or defensive context was employed by Mr. Andrade. His opinion includes choices made by the defendants and in part calls for speculation on the defendant's state of mind.

"His testimony included references to their being afraid, their being subject to increased vulnerability because of their race, their income, and Ms. Pastran's status of being pregnant, and also because there was a high crime area.

"These are not matters within the scope of how science interacts with the mechanics of a crime or crime reconstruction.

"In this case there's video evidence of the event. There's no reconstruction that's needed. There's no special skill or special knowledge that's needed to review the video, video evidence including what is seen on the video, and decide whether or not there's any intent or motive depicted.

"This is not a case of who did it. This is a case of why and under what circumstances. Expert testimony cannot take the place of the jury's determination of the facts including intent and mental state and motive.

"Dr. Turvey's testimony, as outlined in the 402 hearing, adds nothing to the jury's information, and they are well equipped to evaluate the evidence including the video evidence and decide what, if anything, it shows, and whether or not Mr. Andrade was in a defensive mode or offensive mode, or otherwise.

"I understand [Andrade's counsel's] comments that it might be desirable to highlight certain aspects of the video by having a witness go through it step by

8.

step, but that doesn't have to be accompanied by expert opinion that want to usurp the jury's role in deciding what the video shows and what the facts are in the case.

"It's the jury's determination that's going to decide the case, what they think about the evidence and what they think about how the evidence applies to the law in the case.

"In addition, the Court is pointing out that Dr. Turvey's expertise is in crime scene reconstruction and crime scene analysis and is not extended to the determination of whether or not a crime occurred and/or what defenses are shown by the evidence.

"Dr. Turvey is qualified to testify as to crime scene analysis. Crime scene – his opinion on the crime scene analysis, at least as articulated in the 402 hearing, was that the crime scene did not reveal a weapon that was in the hand of the decedent just before he was shot. He's qualified to give this opinion on the crime scene. And his opinion is limited to – his criticism of the crime scene management is limited to the failure of law enforcement to keep a crime scene log and failure of law enforcement to collect and process the bottle held by the decedent. And I'll note that these are criticisms the People contend are not supported by the evidence. The 402 hearing didn't resolve whether or not they were. That's my understanding of his opinion.

"To the extent that Dr. Turvey could offer insight into the processing of the current crime scene, his opinion is limited to that lack of crime scene log and lack of law enforcement locating and testing the appropriate bottle that was touched by the decedent. This is of limited evidentiary value in my view. Neither defendant is relying on the processing of the bottle or poor crime scene management.

"On the other hand, the potential for prejudice is high. There is a substantial danger, in my view, that Dr. Turvey's answers on this limited subject matter will delve into improper areas. His opinions in this case are intertwined. That was obvious from his testimony at the 402 hearing, because it was very difficult for him to give answers to counsel that did not leak into other areas, even though the question didn't call for it, even despite the Court's admonition to only answer the questions being posed.

"His opinion on these issues appear to be intertwined. In front of a jury with two defendants, the risk of prejudice is high particularly to Mr. Andrade and, in my view, it's too great to risk the value of his opinion on those two small areas and is too great to risk that he would give additional information that has been excluded.

9.

"In sum what I'm saying is that although Dr. Turvey is qualified to testify on crime scene analysis and it's a proper subject for expert testimony in this case, it fails the [Evidence Code section] 352 analysis because the evidentiary value is very, very low and is substantially outweighed by the prejudicial impact, and it will also consume an enormous amount of time given the nature of Dr. Turvey's testimony and the careful tight rope that the Court and counsel would have to walk in order to get that very limited information.

"So there is nothing left I can see for Dr. Turvey to testify to in this case properly. Dr. Turvey's testimony is therefore excluded."

*Analysis*

Pastran contends the court abused its discretion in excluding Dr. Turvey's testimony.

" 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' [Citation.] 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 425-426 (*McDowell*).)

*Proffered Testimony Concerning Increased Vulnerability*

The trial court excluded the proffered testimony regarding Pastran and Andrade's "increased vulnerability" on two grounds: (1) that Dr. Turvey was not qualified to offer that particular opinion and (2) it was not a proper subject for expert testimony because the jury would decide what position Andrade and Pastran were in and what affect, if any, it had on their conduct.

The underlying facts that Pastran was pregnant and that the Venice Motel is a high crime area were made known to the jury. And the vulnerability that comes with pregnancy is rather straightforward and a matter of common knowledge. Similarly, any inferences to be drawn about the potential need for self-defense in a high crime area can

10.

easily be drawn by a jury without the aid of expert testimony.  As a result, it was eminently reasonable for the trial court to conclude that these areas were not "sufficiently beyond common experience," (Evid. Code § 801, subd. (a)) so as to warrant expert testimony.  Because the trial court's ruling was justified on this ground alone, we do not reach Dr. Turvey's qualifications on this topic.

*Proffered Testimony Concerning Flight*

With respect to Dr. Turvey's proffered opinion that there can be innocent explanations for fleeing a scene, the trial court ruled the opinion was within the jury's purview.  We agree.  Again, " 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*McDowell, supra,* 54 Cal.4th at pp. 425-426.) The fact that someone might flee a scene for innocent reasons is not "sufficiently beyond common experience."  To the contrary, "*it is a matter of common knowledge* that men who are entirely innocent do sometimes fly from the scene of a crime[.]" (*Alberty v. United States* (1896) 162 U.S. 499, 511, italics added.)

*Proffered Testimony Concerning Defensive Force*

Dr. Turvey stated one of his opinions to be: "My conclusion is that it's defensive context and he took a defensive posture."  When asked about what a "defensive context" meant, Dr. Turvey said that Andrade had "a defensive attitude and posture."  He said this "context" was "[c]learly evidence[d] from watching the video."

The court concluded this proffered testimony concerning defensive force "adds nothing to the jury's information[.]"  We agree.  The jury does not need an expert to describe what is clearly evident on a video and then say why he believes it shows self-defense.  Instead, the jury can watch the video, and *counsel* can *argue* the inferences he hopes the jury will draw from it.  No part of that process requires an expert.  As a result, we see no abuse of discretion in the court's ruling.

*Proffered Testimony Concerning Crime Scene Processing*

11.

Finally, the court ruled that the limited evidentiary value of the proffered testimony concerning crime scene processing was substantially outweighed by the danger for undue prejudice, and therefore excluded the evidence under Evidence Code section 352.

Under that provision, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We will not disturb a trial court's ruling under this statute " 'except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hinojos* (2025) 110 Cal.App.5th 524, 549.)

As the trial court observed, Dr. Turvey's opinion on this topic was "limited to that lack of crime scene log and lack of law enforcement locating and testing the appropriate bottle that was touched by the decedent." The court concluded this proffered testimony was of "limited" evidentiary value. We agree. Pastran's brief offers no explanation for the probative value of the absence of a crime scene log or testing of the bottle. The only obvious inference beneficial to the defense is the general one that if law enforcement did a poor or incomplete job in one area of the investigation it may have done so in other areas as well. Perhaps that inference would be more probative if there were not direct video evidence of the shooting in this case. The shooter's identity was clear, so this is not a situation where law enforcement might have missed another promising suspect. Instead, the jury in this case was essentially called upon to determine whether the shooting was the result of self-defense or heat of passion. It is unclear how even an incomplete law enforcement investigation could conceivably inure to Pastran's benefit in a meaningful way. If there is such an explanation, it was incumbent upon her to present it in her appellate briefing.

12.

The court further concluded Dr. Turvey's testimony would take an inordinate amount of time. We see no abuse of discretion in that conclusion. Adding an arguably unnecessary expert to trial would "necessitate undue consumption of time," (Evid. Code, § 352) especially given Dr. Turvey's longwinded nature evidenced at the 402 hearing. We see no abuse of discretion in the trial court's ruling under Evidence Code section 352.

**DISPOSITION**

The judgment is affirmed.


FAIN, J.*

WE CONCUR:


PEÑA, Acting P. J.


DE SANTOS, J.

---

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.